IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| | | |
|---|---|---|
| MARK C. GRIFFIN, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | Case No.: _____ |
| v. | ) ) | (Removed from Franklin County Circuit Court, Case No. 2019-CV-157) |
| 3M COMPANY; 3M OCCUPATIONAL SAFETY LLC; AEARO HOLDINGS, LLC; AEARO INTERMEDIATE, LLC; AEARO, LLC; and AEARO TECHNOLOGIES LLC, | ) ) ) ) ) | Jury Demand |
| Defendants. | ) ) | |

---

## NOTICE OF REMOVAL

---

Pursuant to 28 U.S.C. §§ 1332, 1441, 1442(a)(1), 1446, and 1453, Defendants 3M

Company, 3M Occupational Safety LLC, Aearo Holdings, LLC, Aearo Intermediate, LLC, Aearo

LLC, and Aearo Technologies LLC (collectively, the "Defendants") hereby give notice of the

removal of this Class Action Complaint from the Circuit Court for Franklin County Tennessee to

the United States District Court for the Eastern District of Tennessee, Winchester Division.

As grounds for this Notice of Removal, Defendants state as follows:

1.     Defendants appear, by and through counsel, for the limited purpose of removing

this proposed class action from the Circuit Court of Franklin County, Tennessee. Defendants

reserve the right to raise all defenses and objections in this action after its removal to this Court.

### I.  PROCEDURAL HISTORY

2.     On or about July 26, 2019, Plaintiff Mark C. Griffin ("Plaintiff") commenced this

proposed class action against Defendants by filing a Summons and Class Action Complaint in the

Circuit Court for Franklin County, Tennessee, Case No. 2019-CV-157, a copy of which is attached as part of Exhibit 1.

3.      Defendants were served on August 23, 2019.

4.      In the Class Action Complaint, Plaintiff alleges he is seeking judgment against the Defendants "for personal injuries sustained from Defendants' defective and unreasonably dangerous product, the Dual-ended Combat Arms™ earplugs Version 2" (the "Combat Arms Earplugs"). (*See* Compl., Introductory Paragraph.) Plaintiff alleges he suffered personal injuries while in training and/or on active duty in the United States Military domestically and abroad as a result of using the Combat Arms Earplugs. (Compl. ¶¶ 1–3, 13.) Plaintiff alleges the use of the Combat Arms Earplugs caused him to suffer "significant hearing loss, tinnitus, and/or additional injuries related to hearing." (*Id.* ¶¶ 6, 101–110.)

5.      Plaintiff's lawsuit is styled a "Class Action Complaint." Plaintiff filed his lawsuit as a Class Action pursuant to Federal Rule of Civil Procedure 23 on behalf of himself and the following proposed class: "All individuals in the United States and United States territories who used Defendants' dangerously defective Dual-ended Combat Arms earplugs during their service in the United States Military." (*Id.* ¶ 110.) Plaintiff also brings his Complaint on behalf of six "subclasses," as outlined in Paragraph 111 of his Complaint. (*Id.* ¶ 111.)

6.      Plaintiff's Class Action Complaint alleges the following 15 counts: (I) Negligence; (II) Strict Liability – Defective Product; (III) Strict Liability – Failure to Warn; (IV) Strict Liability – Design Defect; (V) Breach of Express Warranty; (VI) Breach of Implied Warranty; (VII) Fraud; (VIII) Constructive Fraud; (IX) Negligent Misrepresentation; (X) Gross Negligence; (XI) Injunctive Relief; (XII) Declaratory Relief; (XIII) Punitive Damages; (XIV) Fraudulent Concealment; and (XV) Discovery Rule and Tolling. (Compl. ¶¶ 119–294.)

7.      Plaintiff and the proposed class members demand judgment against Defendants for, among other items, compensatory and punitive damages, pre-judgment interest, costs, reasonable attorneys' fees, and all damages associated with the Combat Arms Earplugs. (Compl. Prayer for Relief, pp. 54–55.)

8.      True and correct copies of all the pleadings, process, and orders served upon Defendants in the state court action are attached as Exhibit 1.

## II. BACKGROUND

9.      The Combat Arms Earplug is an earplug with two insertable ends developed specifically for the needs of the U.S. military for use as hearing protection in noisy environments. The Combat Arms Earplug has a yellow end and green end. Each end has a different purpose. When the yellow end of the earplug is inserted, users can still hear nearby low-level sounds, like verbal communication, but receive protection from high-level impulse noise, like gunfire. In contrast, when the green end of the earplug is inserted, the Combat Arms Earplug acts like a traditional earplug, providing steady and continuous protection from both ambient and impulse noises.

10.     In the area of national defense, the U.S. military relies on close collaboration with private contractors to design and develop products, such as the Combat Arms Earplug, and manufacture and supply those products in accordance with highly particular specifications balancing the multitude of operational and budgetary needs of equipping the nation's fighting forces. This litigation involves a classic example of that military-contractor collaboration.

11.     The Combat Arms Earplug was designed at the request of and in consultation with military audiologists, including Dr. Doug Ohlin. Dr. Ohlin at the time served in the capacity of Program Manager, Hearing Conservation, U.S. Army Center for Health Promotion and Preventive

Medicine. Dr. Ohlin and his program directed Aearo to ensure that the Combat Arms Earplug would appropriately balance performance with military operational needs for soldiers and military personnel. For example, Dr. Ohlin proposed the inclusion of the filter that was a key updated feature of the Combat Arms Earplug. Dr. Ohlin specifically directed Aearo to ensure that the Combat Arms Earplug would fit into a military-issued carrying case. Dr. Ohlin also was involved in Aearo's testing of the Combat Arms Earplug.

12.     Following the product's development, Dr. Ohlin was involved in the ultimate approval of the Combat Arms Earplug for military use and proposed purchasing the Combat Arms Earplug to the Joint Readiness Clinical Advisory Board. The military's specifications for the Combat Arms Earplug reflect the design direction that Dr. Ohlin and his program gave to Aearo. In particular, these specifications are memorialized in a Medical Procurement Item Description ("MPID") that was used by the Defense Logistics Agency (the U.S. military's purchasing authority) in soliciting bids from Aearo for the Combat Arms Earplug. Among other things, the MPID specified "military unique, double-ended ear plugs suitable for use as hearing protectors for military personnel in chronically noisy environments," that should "be designed to provide protection from the unique noises created by military firearms, while allowing the wearer to clearly hear normal speech . . . such as voice commands, on the battlefield" and should be "camouflage green or another suitable dark color."

13.     Dr. Ohlin's involvement continued following the military's decision to purchase and deploy the Combat Arms Earplug.  He provided Aearo with feedback from military personnel as to using the Combat Arms Earplug and developed training and instructions for military personnel.

4

14.     In sum, the Combat Arms Earplug was launched at the request of, and in close coordination with, the U.S. military. The Combat Arms Earplug's design reflects the direction and feedback of individuals acting on behalf of the U.S. military. The U.S. military purchased the Combat Arms Earplug and issued it to service members like Plaintiff precisely because the Combat Arms Earplug fulfilled the military's specifications and accomplished the military's goal of balancing hearing protection with operational needs.

## III. BASIS FOR JURISDICTION IN THIS COURT

15.     This Court has jurisdiction over this action and the case is therefore removable. Specifically, this action is removable for three separate and independent reasons.

16.     ***First***, this Court has diversity jurisdiction under 28 U.S.C. § 1332 because, in this proposed class action, the parties are citizens of different states, the amount in controversy exceeds $5,000,000, and the proposed class includes at least 100 members. Thus, removal is proper under 28 U.S.C. § 1441, 1446, and 1453.

17.     ***Second***, removal is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). The Combat Arms Earplugs were designed by Aearo Technologies LLC ("Aearo") in close collaboration with the United States military.[1] The Combat Arms Earplugs represented a revolutionary breakthrough in hearing protection for service members by allowing soldiers to maintain situational awareness (*e.g.*, to hear nearby voice commands) while also maintaining some protection from gunfire and other higher decibel impulse sounds.  The Combat Arms Earplugs met the U.S. military's specifications and helped the military provide hearing protection to service members. Aearo was acting under the direction of a federal officer when it designed and sold the Combat Arms Earplugs, and Defendants intend to assert various federal defenses—including the

---

[1] 3M Company acquired Aearo in 2008. (Compl. ¶ 32.)

5

federal contractor defense and the combatant activities defense—in response to Plaintiff's claims. *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1180 (7th Cir. 2012) (removal under the federal officer removal statute "promotes litigating federal defenses … in a federal forum so that 'the operations of the general government are not arrested at the will of one of the states'") (*quoting Tenn. v. Davis*, 100 U.S. 257, 263 (1879)) (internal bracketing omitted).

18.     ***Third***, this Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff's alleged injuries occurred at least in part on "federal enclaves"—namely, U.S. military facilities—and thus removal is proper under 28 U.S.C. § 1441. (*See* Compl. ¶¶ 2, 13, 101–110) (Plaintiff alleges he used Combat Arms Earplugs while in service with the United States Military from 1999 to 2013)); *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) ("Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'").

### A.     This Court Has Diversity Jurisdiction

19.     The Court has diversity jurisdiction over this proposed class action because the parties are diverse, the aggregate amount in controversy exceeds $5,000,000, and the proposed class includes at least 100 members. 28 U.S.C. § 1332(d)(2)-(6). The Class Action Fairness Act ("CAFA") "confers federal jurisdiction over class actions in which the matter in controversy exceeds $5 million, there is minimal diversity of citizenship, and the proposed class includes at least one hundred members." *In re Mortgage Electronic Registration Systems, Inc.*, 680 F.3d 849, 853 (6th Cir. 2012). "Minimal diversity" exists when at least one plaintiff is a citizen of a different state from at least one defendant. *Doe v. Trump Corp.*, 385 F. Supp. 3d 265, 283 (S.D.N.Y. 2019).

4812-4680-4644.2

20.     The proposed class contains well more than 100 potential members, and, according to the Class Action Complaint, may include "thousands, if not millions," of potential class members. According to the Class Action Complaint, Defendants' Combat Arms Earplugs were provided to certain branches of the military (including Plaintiff's) between at least 2003 and 2015. (Compl. ¶ 7.) "Thus, use of Defendants' Dual-ended Combat Arms earplugs has likely caused thousands, if not millions, of soldiers to suffer significant hearing loss, tinnitus, and additional injuries related to hearing loss, including but not limited to pain and suffering and the loss of the pleasures of life." (*Id.*)

ii.     The Parties Are Diverse

21.     Plaintiff is a citizen of Tennessee.  (Compl. ¶ 13.)

22.     Defendant 3M Company is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in Minnesota. (Compl. ¶ 14.) Accordingly, 3M Company was, at the time of filing of the Class Action Complaint, and still is, a citizen of the states of Delaware and Minnesota within the meaning of 28 U.S.C. §1332 (c)(1), which provides that "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."

23.     Defendant 3M Occupational Safety LLC is a citizen of the states of Delaware and Minnesota. Under the CAFA, "an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized." 28 U.S.C. § 1332(d)(10). An "unincorporated association" under 28 U.S.C. § 1332(d) includes a limited liability company. *Ferrell v. Express Check Advance of SC LLC*, 591 F.3d 698, 699–700 (4th Cir. 2010). 3M Occupational Safety LLC is a Delaware limited liability company with a

principal place of business in Minnesota. As a result, 3M Occupational Safety LLC is a citizen of Delaware and Minnesota.

24.     Defendant Aearo Holding LLC is a Delaware limited liability company with a principal place of business in Minnesota. Therefore, for purposes of the CAFA, Aearo Holding LLC is a citizen of Delaware and Minnesota. 28 U.S.C. § 1332(d)(10).

25.     Defendant Aearo Intermediate LLC is a Delaware limited liability company with a principal place of business in Indiana. Therefore, for purposes of the CAFA, Aearo Intermediate LLC is a citizen of Delaware and Indiana. 28 U.S.C. § 1332(d)(10).

26.     Defendant Aearo LLC is a Delaware limited liability company with a principal place of business in Indiana. Therefore, for purposes of the CAFA, Aearo LLC is a citizen of Delaware and Indiana. 28 U.S.C. § 1332(d)(10).

27.      Defendant Aearo Technologies, LLC is a Delaware limited liability company with a principal place of business in Indiana. Therefore, for purposes of the CAFA, Aearo Technologies LLC is a citizen of Delaware and Indiana. 28 U.S.C. § 1332(d)(10).

iii.     The Aggregate Amount in Controversy Exceeds $5,000,000

28.     It is apparent from the face of the Class Action Complaint the aggregate amount in controversy in this case clearly exceeds the sum or value of $5,000,000, exclusive of interest and costs. *See* 28 U.S.C. § 1332(d)(2). "In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs." 28 U.S.C. § 1332(d)(6). "A court 'may make common-sense inferences about the amount put at stake by the injuries' the plaintiffs claim." *Thompson v. La. Reg'l Landfill Co.*, 365 F. Supp. 3d 725, 730 (E.D. La. 2019) (quoting *Robertson v. Exxon Mobile Corp.*, 814 F.3d 236, 240 (5th Cir. 2015)); *see also Dart Cherokee Basin*

4812-4680-4644.2
Case 4:19-cv-00061-TAV-SKL     Document 1     Filed 09/19/19     Page 8 of 26     PageID #: 8

*Operating Co. v. Owens*, 135 S. Ct. 547, 554 (2014) (holding "a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold"; the notice need not contain evidentiary submissions).

29.     Plaintiff alleges the use of Defendants' Combat Arms Earplugs "has likely caused thousands, if not millions, of soldiers to suffer significant hearing loss, tinnitus, and additional injuries related to hearing loss, including but not limited to pain and suffering and the loss of the pleasures of life." (Compl. ¶ 7.) Plaintiff alleges that Defendants are strictly, jointly, severally, and *in solido* liable to Plaintiff and the proposed class members for "significant hearing loss, tinnitus, and additional injuries related to hearing loss, including but not limited to pain and suffering and the loss of the pleasures of life, and other damages complained of herein." (*Id.* ¶ 8.) Plaintiff and the class members demand judgment against Defendants for, among other items, compensatory and punitive damages, pre-judgment interest, costs, reasonable attorneys' fees, and all damages associated with the Combat Arms Earplugs. (Compl. Prayer for Relief, pp. 54–55.)

30.     There is no evidence showing to a legal certainty that the amount in controversy has not been met.  *See St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938) ("It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal."). A claim for punitive damages alone "will generally satisfy the amount in controversy requirement because it cannot be stated to a legal certainty that the value of the plaintiff's claim is below the statutory minimum." *Diehl v. CSX Transp., Inc.*, 349 F. Supp. 3d 487, 495 (W.D. Pa. 2018). Based on the nature of the Plaintiff's claims, the thousands if not millions of potential class members, and the request for both compensatory and punitive damages, the amount in controversy requirement has been met. *Dart*, 135 S. Ct. at 554.

31.     Therefore, all the requirements have been satisfied for removal under 28 U.S.C. §§ 1332, 1441, 1446, and 1453. Because the proposed class contains more than 100 members, the controversy in this civil action is wholly between citizens of different states, and the amount in controversy exceeds the sum of $5,000,000, exclusive of costs and interest, Defendants may remove this action pursuant to 28 U.S.C. §§ 1332, 1441, 1446, and 1453.

**B.     Removal Is Proper Under the Federal Officer Removal Statute**

32.     Removal is also proper under 28 U.S.C. § 1442(a)(1), which provides for removal when a defendant is sued for acts undertaken at the direction of a federal officer.

33.     Removal rights under this section are much broader than under the general removal statute, 28 U.S.C. § 1441. *See Ayo v. 3M Co.*, 2018 WL 4781145, at *6 (E.D.N.Y. Sept. 30, 2018) ("[W]hile removal under the general removal statute, 28 U.S.C. § 1441, is generally disfavored, removal under the federal officer removal statute is favored in the interest of public policy.") (internal citations and quotations omitted). Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson Cty. v. Acker*, 527 U.S. 423, 431 (1999). This is because Section 1442 protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prod.*, 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011). This important federal policy "should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). A court analyzing removal under the federal officer statute "views the facts in the light most favorable to the defendants." *Ayo*, 2018 WL 4781145, at *6.

34.     "Federal officer removal is proper when the defendant (1) is a person within the meaning of the statute, (2) is acting under the United States, its agencies, or its officers, (3) is

10

4
812-4680-4644.2

ase 4:19-cv-00061-TAV-SKL   Document 1   Filed 09/19/19   Page 10 of 26   PageID #: 10

acting under color of federal authority, and (4) has a colorable federal defense." *Betzner v. Boeing Co.*, 910 F.3d 1010, 1015 (7th Cir. 2018) (internal citations omitted); *Mesa v. Cal.,* 489 U.S. 121, 124–25, 129–31, 13435 (1989) (same). All requirements for removal under § 1442(a)(1) are satisfied here.

### i. Defendants are "Persons" Under the Federal Officer Removal Statute

35. Defendants are "persons" under the federal officer removal statute because all of the Defendants are either corporations or limited liability companies. *See Betzner*, 910 F.3d at 1015 ("Corporations are persons under § 1442(a), and so, Boeing has easily satisfied the 'person' requirement within the meaning of the federal officer removal statute."); *Shaw v. APWU Health Plan*, 2019 WL 3729479, at *2 (E.D. Mich. Aug. 8, 2019); *St. Bernard Port, Harbor & Terminal Dist. v. Violet Dock Port, Inc.*, 809 F. Supp. 2d 524, 530 (E.D. La. 2011) (holding that limited liability company was a "person" for purposes of federal officer removal statute); *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016) (for purposes of § 1442(a)(1), the term "person" includes "'companies, associations, firms, [and] partnerships.'").

### ii. The 'Acting Under' Requirement Is Satisfied

36. To satisfy the second requirement ("acting under" a federal officer), "a private person's actions 'must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior.'" *Jacks v. Meridian Res. Co.,* 701 F.3d 1224, 1230 (8th Cir. 2012) (quoting *Watson v. Philip Morris Cos.*, 551 U.S. 142, 152 (2007)). "The words 'acting under' are to be interpreted broadly, and the statute as a whole must be liberally construed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 136 (2d Cir. 2008) (quoting *Watson*, 551 U.S. at 147). Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or

11

agency." *Papp,* 842 F.3d at 813. "Instead . . . it is sufficient for the 'acting under' inquiry that the allegations are directed at the relationship between the defendant and the federal officer or agency." *Id.* (internal alterations omitted).

37.     The "acting under" requirement is met here because Plaintiff directly challenges Defendants alleged conduct in providing vital products "that, in the absence of Defendant, the Government would have had to produce itself." *Isaacson, 517* F.3d at 137.  As discussed above, Aearo designed and manufactured the Combat Arms Earplug at the direction of the U.S. military to meet the military's specific needs to provide hearing protection to soldiers, and those soldiers used this hearing protection in a time of war.

38.     Indeed, Plaintiff's Complaint effectively concedes that Defendants were "acting under" federal officers of the Department of Defense and its agencies when manufacturing and selling the Combat Arms Earplug Plaintiff was provided.  Plaintiff alleges that Defendants specifically sold the Combat Arms Earplug for the military's use, becoming the "exclusive supplier" of earplugs to U.S. Military personnel.  (Compl. ¶¶ 4, 38, 75–76.)

39.     Not only did Defendants meet specific performance criteria established by the U.S. Government, it developed the Combat Arms Earplug under the direction of, and with significant involvement of, representatives of the U.S. military. *See*, *e.g.*, *Ruppel*, 701 F.3d at 1181 (holding that defendant was "acting under" a federal officer because it "worked hand-in-hand with the government, assisting the federal government in building warships.  'Acting under' covers situations, like this one, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete.").[2]

---

[2] *See also Isaacson,* 517 F.3d at 137 ("Defendants contracted with the Government to provide a product that the Government was using during war—a product that, in the absence of Defendants, the Government would have had to produce itself."); *Caver v. Central Al. Elec. Coop.*, 845 F.3d 1135, 1142–45 (11th Cir. 2017) (finding "acting under" requirement satisfied where defendant assisted the government in accomplishing its goals by providing electricity

12

4812-4680-4644.2

40.     As described above, the military's involvement went beyond merely establishing standards or general guidelines. Its involvement included requests to modify operational features, such as ensuring the Combat Arms Earplug would fit in military-issued containers by shortening the stem. Such involvement is quintessential activity "acting under" a federal officer. *See, e.g., Winters v. Diamond Shamrock Chem. Co.,* 149 F.3d 387, 396–401 (5th Cir. 1998) (authorizing removal of a tort suit against private defense contractors that manufactured Agent Orange); *Ayo*, 2018 WL 4781145, at *8–9 (3M "acted under" a federal officer when it "helped the government" develop an important military product "at the government's request").[3]

### iii.     The 'Causation' Requirement Is Satisfied

41.     Whether a defendant's actions were taken "under color of federal office . . . has come to be known as the causation requirement." *Isaacson,* 517 F.3d at 137 (internal quotation marks, alterations, and citation omitted); *see also Betzner*, 910 F.3d at 1015 (the "acting under the color of federal authority" requirement," is "distinct from the 'acting under' requirement in the same way a bona fide federal officer could not remove a trespass suit that occurred while he was taking out the garbage—there must be a 'causal connection between the charged conduct and asserted official authority'"). Like the "acting under" requirement, "[t]he hurdle erected by this requirement is quite low." *Isaacson*, 517 F.3d at 137. Courts "credit Defendants' theory of the case

---

to rural areas); *In re National Prescription Opiate Litig.,* 327 F. Supp. 3d 1064, 1075–76 (N.D. Ohio 2018) (removal under § 1442 was appropriate where defendant was subject to "precise specifications" of government contract, administration of contract was overseen by federal official, and absent defendant's role, government would have had to warehouse and distribute product itself).

[3] *Gordon v. Air & Liquid Sys. Corp.,* 990 F. Supp. 2d 311, 318 (E.D.N.Y. 2014) (contractor was "acting under" a federal officer for purposes of removal statute when it provided products used in construction of ships "because the Navy agreed to procure them"); *Marley v. Elliot Turbomachinery Co.,* 545 F.Supp.2d 1266, 1273 (S.D. Fla. 2008) (finding the "acting under" requirement was satisfied where defendants' manufacturing and supplying of asbestos-containing products occurred in the course of their contractual relationship with the Navy); *Betzner*, 910 F.3d at 1015 ("Boeing plausibly alleged that it acted under federal officers when it contracted to manufacture heavy bomber aircraft for the United States Air Force, and that it acted under the military's detailed and ongoing control.").

when determining whether [this] causal connection exists." *Id. (*citing *Acker,* 527 U.S. at 432 (holding that "demanding an airtight case on the merits in order to show the required causal connection" would "defeat the purpose of the removal statute"));[4] *see Marley*, 545 F. Supp. 2d at 1274 ("All a defendant needs to do to show a causal nexus is to establish that the plaintiff's claims arise from the defendants' performance of their duties under contract with the Navy. This the defendants have done.") (citing *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427–28 (11th Cir. 1996)). In 2011, Congress further expanded Section 1442 by amending section 2(b) to permit removal "for *or relating to* any acts under color" of federal office, so as "to broaden the universe of acts that enable Federal officers to remove to Federal court." H.R. REP. 112-17, 2011 WL 692207, at *6 (emphasis showing addition).

42.    "To show causation, Defendants must only establish that the act that is the subject of Plaintiffs' attack . . . occurred *while* Defendants were performing their official duties." *Isaacson*, 517 F.3d at 137–38 (emphasis in original). Here, Plaintiff's claims arise from Defendants' production and sale of Combat Arms Earplugs to military specifications. Plaintiff alleges that the design of the Combat Arms Earplug is defective in that the length of the stem allows the third flange of the non-inserted end to prevent a "snug fit and proper seal in the ear canal of the user" (Compl. ¶¶ 41, 42.) Defendants developed and designed the Combat Arms Earplug, including establishing its purportedly defective length, at the direction of federal officers, while performing their contractual duties. *Marley*, 545 F. Supp. 2d at 1274; *see Ayo*, 2018 WL 4781145, at *9 (denying motion to remand and finding causal connection where the conduct complained of occurred because of what the government asked contractors to do); *see also Corley v. Long-Lewis, Inc.*, 688 F. Supp. 2d 1315, 1334 (N.D. Ala. 2010) (finding a "causal nexus" where defendant designed turbines

---

[4] The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht*, 2011 WL 5109532, at *5.

4812-4680-4644.2

under the supervision of the Navy, according to its specifications); *French v. A.W. Chesterton Co.*, 2016 WL 6649281, at *4 (E.D. Ohio Nov. 10, 2016) (noting the causal connection requirement may be satisfied if the defendants relationship with plaintiffs derived solely from their official duties).

43.     Further, even if Plaintiff were to assert that any alleged defect was the result of an act not specifically contemplated by the government contract, "it is enough that the contracts gave rise" to the harm alleged. *See Isaacson,* 517 F.3d at 138. "[W]hether the challenged act was outside the scope of Defendants' official duties, or whether it was specifically directed by the federal Government, is one for the federal—not state—courts to answer." *Id. (*citing *Willingham,* 395 U.S. at 409). Thus, any argument that the alleged defect was not specifically directed by the government cannot defeat federal officer removal. *See Ayo*, 2018 WL 4781145, at *9 ("To satisfy the causation requirement, Manufacturing Defendants need only show that the conduct at issue occurred during their performance of the government-directed action, even if the government did not call for the complained-of act.").

iv.     <u>Defendants Have 'Colorable' Federal Defenses</u>

44.     Defendants intend to assert federal defenses in response to Plaintiff's claims, including both the government contractor defense and the combatant activities defense.

45.     Courts around the country have held that the government contractor defense and the combatant activities defense support removal under § 1442(a)(1). *See, e.g., Betzner*, 910 F.3d at 1015–16 (finding colorable government contractor defense supports removal under Section 1442); *Jacks,* 701 F.3d at 1235 (government contractor defense supports removal under § 1442); *Isaacson,* 517 F.3d at 139 (same); *Zeringue v. Crane Co.,* 846 F.3d 785, 790–92 (5th Cir. 2017) (same); *McMahon v. Presidential Airways, Inc.,* 410 F. Supp. 2d 1189, 1197–1200 (M.D. Fla. 2006) (both government contractor defense and combatant activities defenses supported removal under Section

15

1442); *Norwillo v. Purple Shovel, LLC*, 2017 WL 10294856, at *2 (M.D. Fla. Mar. 21, 2017) ("STL asserts that it will advance colorable defenses, i.e. preemption and the government contractor defense.").

46.     A defendant need not prove its defense at the removal stage; a defendant need only show that a federal defense is "colorable." *Jacks,* 701 F.3d at 1235. Courts will not "require that these defenses be clearly sustainable in order to support removal under § 1442(a)(1)." *Id. (*citing *Willingham,* 395 U.S. at 406–07 ("[The federal officer removal statute] is broad enough to cover all cases where federal officers can raise a colorable defense. . . . The officer need not win his case before he can have it removed.")); *Magnin*, 91 F.3d at 1427 ("That defense need only be plausible; its ultimate victory is not to be determined at the time of removal."); *Corley*, 688 F. Supp. 2d at 1332 (same); *see also Shaw*, 2019 3729479, at *2 ("A defense need only be plausible to be colorable") (citation omitted). As the Seventh Circuit explained in *Betzner*:

> The colorable federal defense requirement fulfills Article III jurisdiction and reflects Congress's intent to have federal defenses litigated in federal court. *Id.* at 1182. "Requiring the defense only be colorable, instead of 'clearly sustainable,' advances this goal" and "at this point, we are concerned with who makes the ultimate determination, not what that determination will be." *Id.* (internal citations omitted); *see also Willingham*, 395 U.S. at 407, 89 S.Ct. 1813 (A defendant invoking § 1442(a) "need not win his case before he can have it removed."); *Venezia*, 16 F.3d at 212 ("A federal defendant need not show that he is entitled to prevail in order to have access to the federal forum.") (emphasis in original).

910 F.3d at 1015-16.

47.     Additionally, at the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo v. Crane Co.*, 771 F.3d 113, 116 (2d Cir. 2014) (citing *Kircher v. Putnam Funds Trust,* 547 U.S. 633, 644 n. 12 (2006)); *Betzner*, 910 F.3d at 1016 (holding that "the district court erred in concluding that Boeing was required to submit

evidence to support its removal allegations").[5]  Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants."  *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783–84 (E.D. Pa. 2010).  "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'"  *Cuomo,* 771 F.3d at 116 (quoting *Willingham,* 395 U.S. at 409).

### a.  *Defendants Have A Colorable Government Contractor Defense*

48.     Under the government contractor defense, the defendant is not liable for alleged defects or negligence with respect to military equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States."  *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988); *see also Betzner*, 910 F.3d at 1016 (same).

49.     Defendants have satisfied all of these elements for purposes of removal.  *First*, the Defense Logistics Agency established reasonably precise specifications governing double-ended non-linear earplugs' performance, testing, inspection, packaging, and labeling, with which the Combat Arms Earplug complied. The Combat Arms Earplug was subject to stringent military specifications. *Second*, when properly used, the Combat Arms Earplug fully conforms to those specifications. *Third*, the government was adequately informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring the Combat Arms Earplug.  The U.S. military was actively involved in discussions with

---

[5] *See also Kraus v. Alcatel-Lucent*, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage. Instead, [the court] only determines whether there are sufficient facts alleged to raise a colorable defense.").

Aearo in the development of the Combat Arms Earplug regarding its length and instructions for use. Aearo's engineers discussed the challenges, and trade-offs, in conforming the design of the Combat Arms Earplug to fit within the military's desired carrying cases and with its other equipment. These facts are more than enough to support a "colorable" government contractor defense and removal under the federal officer statute. *See Betzner*, 910 F.3d at 1016 (finding government contractor defense colorable where defendant provided plausible allegations it manufactured aircraft according to government specifications and government was aware of any potential hazards).

50.     At minimum, this constitutes colorable evidence that the U.S. military generally "made a discretionary determination" regarding the requirements and design of the Combat Arms Earplug's benefits against the alleged risks. *See In re Agent Orange Prod Liab. Litig.,* 517 F.3d 76, 90 (2d Cir. 2008); *Ayo*, 2018 WL 4781145, at *14 (holding removal proper under § 1442 because defendants presented "colorable evidence" that government was aware of alleged problems with product at issue); *Betzner*, 910 F.3d at 1016 (finding government contractor defense colorable where defendant provided plausible allegations it manufactured aircraft according to government specifications); *Corley*, 688 F. Supp. 2d at 1334 (finding a colorable federal contractor defense); *Albrecht*, 2011 WL 5109532, at *5 ("A defendant is not required to warn the government where the government knew as much or more than the defendant contractor about the hazards of the product.") (citation omitted). Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies. *Agent Orange,* 517 F.3d at 89–90; *see also Ayo,* 2018 WL 4781145 at *13.

### b. *Defendants Have A Colorable Combatant Activities Defense*

51.     The "combatant activities defense" is a complete defense for claims arising out of combat activities. Although Congress waived sovereign immunity for tort claims against the United States and those acting on its behalf in the Federal Tort Claims Act, it excluded "claims arising out of combatant activities of the military or armed forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j). The combatant activities exception has been applied to contractors to create a federal defense shielding manufacturers from tort claims arising from war. *See, e.g., Saleh v. Titan Corp.*, 580 F.3d 1, 6–7 (D.C. Cir. 2009) (applying § 2680(j) exception to tort claims arising from treatment of inmates in military prison in Iraq brought against private contractor); *Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486, 1492 (C.D. Cal. 1993) ("The combatant activities exception generates a federal common law defense which immunizes manufacturers such as Hughes from state tort suits arising from war."). The combatant activities defense is broader than the government contractor defense under *Boyle* because it acts like "field preemption because it casts a[n] immunity net over any claim that *arises* out of combat activities." *Saleh,* 580 F.3d at 6 (emphasis in original; internal citation omitted).

52.     Application of the defense has two elements:  (1) the presence of combatant activities; and (2) that such activities occur during a time of war. The combatant activities element has been liberally construed and is not limited to the exertion of physical force. *See Johnson v. U.S.*, 170 F.2d 767, 770–71 (9th Cir. 1948). Rather, "activities both necessary to and in direct connection with actual hostilities" are included. *Id.* at 771. Ammunition supply, troop movement, and logistical support, and holding prisoners of war have all qualified as combatant activities under the test. *See Aiello v. Kellogg, Brown & Root Servs.*, 751 F. Supp. 2d 698, 712 (S.D.N.Y. 2011).

19

53.     Each factor is satisfied here. Plaintiff's Complaint alleges that he was diagnosed, at least in part, because of his involvement in active duty, and that the Combat Arms Earplugs issued to him by the U.S. military failed to provide adequate protection. (Compl. ¶¶ 101–110.) Claims in such circumstances fall within the scope of the combatant activities defense. *See*, *e.g.*, *Bentzlin*, 833 F. Supp. at 1492–95 (holding that claims brought against missile manufacture for causing death of U.S. soldiers as a result of alleged product defect were barred by combatant activities defense).

54.     Accordingly, Defendants have a colorable basis to assert they are immune from tort claims arising from Plaintiff's harm suffered while he was engaged in combatant activities. This defense separately supports federal question jurisdiction under Section 1442 and removal to this Court.

c.     *Defendants Have A Colorable Basis For Asserting That This Case Presents A Nonjusticiable Political Question*

55.     Defendants also intend to argue that Plaintiff's suit presents a nonjusticiable political question. "It is undoubtedly true that military activities often give rise to political questions." *McMahon v. Presidential Airways, Inc.,* 502 F.3d 1331, 1358 (11th Cir. 2007). Courts have recognized that "the interjection of tort law into the realms of foreign policy and military affairs would effectively permit judicial reappraisal of judgments the Constitution has committed to the other branches." *Id.* (citation and internal quotation omitted). Thus, decisions about "strategy and tactics employed on the battlefield" are beyond a federal court's ability to review. *Tiffany v. U.S.,* 931 F.2d 271, 277 (4th Cir. 1991).

56.     "It is well accepted that, in general, soldiers injured at the hands of the military raise political questions." *Whitaker v. Kellogg Brown & Root, Inc.,* 444 F. Supp. 2d 1277, 1281 (M.D. Ga. 2006); *see also Bentzlin,* 833 F. Supp. at 1497–98 ("The policy decisions made in war are clearly beyond the competence of the courts to review . . . ."); *Carmichael v. Kellogg, Brown & Root*

*Servs., Inc.*, 572 F.3d 1271 (11th Cir. 2009) (affirming district court's decision that plaintiff's suit "would require reexamination of many sensitive judgments and decisions entrusted to the military in a time of war"). Moreover, "a soldier injured at the hands of a contractor which is performing military functions subject to the military's orders and regulations also raises the same political questions." *Whitaker,* 444 F. Supp. 2d at 1281.

57.     This is such a case. Plaintiff was a member of the U.S. Army and alleges that he was issued Combat Arms Earplugs by the U.S. military and wore them during his service from 1999 to 2013, including during his deployment to the war in Iraq from 2004 to 2006. (Compl. ¶¶ 13, 101–110.) Plaintiff further alleges that he wore the Combat Arms Earplugs during his time in service and, as a result of its defective condition, now suffers from significant hearing loss, tinnitus, and/or additional injuries related to hearing. (Compl. ¶¶ 6, 101–110.) There is no doubt that the U.S. military made the decision to issue the Combat Arms Earplugs to Plaintiff, that Plaintiff used them during training and active duty while deployed in a war, and that the military directed his activities in combat.[6] *See Whitaker,* 444 F. Supp. 2d at 1279–1282 (concluding that suit against Army contractor for negligent operation of a convoy vehicle presented a political question where the Army regulated "all aspects of control, organization, and planning of Army convoy operations").

58.     As discussed above, the design of the Combat Arms Earplugs reflects the balance struck by the military between hearing protection and military operational needs. The decision to issue the Combat Arms Earplugs to servicemembers and the instructions to servicemembers, like Plaintiff, about when and where to use them, was made by the U.S. military. Accordingly, resolution of Plaintiff's claim for design defect requires inquiry into the military's decisions and conduct. *See*

---

[6]This case is, therefore, unlike *Brokaw v. Boeing Co.*, 137 F. Supp. 3d 1082, 1104–05 (N.D. Ill. 2015), where the court rejected the application of the political question doctrine and remanded to state court because plaintiffs were family members of civilian contractors, not service members, and the military had "only tangential involvement" in those civilians' deaths in a plane crash.

4812-4680-4644.2

*Gilligan v. Morgan,* 413 U.S. 1, 10 (1973) ("The complex subtle, and professional decisions as to the composition, training, equipping and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches."). Plaintiff's claim therefore is nonjusticiable and is barred by the political question doctrine.

### C.   This Court Has Federal Enclave Jurisdiction

59.    In addition, removal of this action is proper because Plaintiff's claim almost certainly arose, at least in part, at a federal enclave—namely, a U.S. military facility. (*E.g.*, (Compl. ¶ 2) ("Plaintiff used Defendants' dangerously defective Dual-ended Combat Arms earplugs during their [*sic*] service in the United States military.").) To that extent, the claims are governed by federal law and are subject to this Court's federal question jurisdiction under 28 U.S.C. § 1331. Thus, this action is removable under 28 U.S.C. § 1441(a).

60.    "A federal enclave is a portion of land over which the United States government exercises federal legislative jurisdiction." *Brookhaven Sci. Assocs., LLC v. Donaldson*, 2007 WL 2319141, at *5 (S.D.N.Y. Aug. 9, 2007) (internal quotation and citation omitted). The Constitution confers on Congress the power "[t]o exercise exclusive legislation" over the District of Columbia "and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings." U.S. Const. art. I, § 8, cl. 17. "It long has been settled that, where lands for such a purpose are purchased by the United States with the consent of the state Legislature, the jurisdiction theretofore residing in the state passes, in virtue of the constitutional provision, to the United States, thereby making the jurisdiction of the latter the sole jurisdiction." *Surplus Trading Co. v. Cook,* 281 U.S. 647, 652 (1930).

22

61.     Because the United States exercises sole lawmaking authority over a federal enclave, the law applicable to that enclave is, by definition, federal law, although such federal law may incorporate state-law rules of decision. *See, e.g., Mater v. Holley*, 200 F.2d 123, 124 (5th Cir. 1952) ("[A]ny law existing in territory over which the United States has 'exclusive' sovereignty must derive its authority and force from the United States and is for that reason federal law"); *accord Macomber v. Bose,* 401 F.2d 545, 546 (9th Cir. 1968) ("State law theretofore applicable within the [ceded] area was assimilated as federal law, to remain in effect until changed by Congress. Rights arising under such assimilated law, arise under federal law and are properly the subject of federal jurisdiction."); *Brookhaven Sci. Assocs., LLC v. Donelson*, 2007 WL 2319141, at *5 (S.D.N.Y. Aug. 9, 2017) ("[W]hen an area becomes a federal enclave, the state law in effect at the time of cession becomes federal law and is the applicable law unless Congress provides otherwise.").

62.     Federal courts have federal-question jurisdiction under 28 U.S.C. § 1331 for actions involving tort claims that arise on federal enclaves. *See*, *e.g.*, *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998) (case was properly removed case to federal court based on movant's status as a "person acting under" a federal officer, and status of the Air Force base as a federal enclave). It follows that such actions, if originally filed in state court, may be removed to federal court under 28 U.S.C. § 1441(a). *See*, *e.g.*, *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1236–37, 1244 (10th Cir. 2012) (affirming grant of summary judgment on state employment law claims as barred by federal enclave doctrine after removal from state court).

63.     While Plaintiff's Complaint does not specifically identify the U.S. military facilities where he was issued and used Combat Arms Earplugs and allegedly suffered hearing damage, one or more of these facilities undoubtedly qualifies as a federal enclave — particularly given that he alleges that he used the Combat Arms Earplugs in connection with American military service. *See*

23

*Jamil v. Workforce Res., LLC*, 2018 WL 2298119, at *1–5 (S.D. Cal. May 21, 2018) (inferring from Complaint that some of the alleged events must have occurred at Marine Corps base, a federal enclave, and denying motion to remand); *see also Corley*, 688 F. Supp. 2d at 1328 ("Failure to indicate the federal enclave status and location of the exposure will not shield plaintiffs from the consequences of federal enclave status."). Because Plaintiff's claim almost certainly arose, at least in part, at a federal enclave, this Court has subject matter jurisdiction over the action, and removal of the action is proper under 28 U.S.C. § 1441(a).

### D. All Other Procedural Requirements Are Satisfied

64. This notice of removal is timely pursuant to 28 U.S.C. § 1446(b) because it is filed within 30 days of service.

65. All Defendants consent to removal of this action.

66. Venue is proper in this district under 28 U.S.C. § 1441(a) because the state court where the suit has been pending is located in this district.

67. Nothing in this Notice of Removal shall be interpreted as a waiver or relinquishment of any of Defendants' rights to assert any defense or affirmative matter, whether pursuant to Fed. R. Civ. P. 8(c), Fed. R. Civ. P. 12(b), or otherwise, including, but not limited to, the defenses of failure to state a claim upon which relief can be granted.

68. A copy of this Notice of Removal is being filed with the Clerk of the Circuit Court for Franklin County, Tennessee at Murfreesboro as provided under 28 U.S.C. § 1446. Defendants are also giving prompt written notice to counsel for the Plaintiff of the filing of this Notice of Removal.

# IV. CONCLUSION

Based on the above, Defendants respectfully request that this action in the Circuit Court of Franklin County, Tennessee be removed to this Court, and that no further proceedings be had in state court.

Respectfully submitted,

BRADLEY ARANT BOULT CUMMINGS LLP


s/ John P. Rodgers
John P. Rodgers (BPR No. 30324)
1600 Division Street, Suite 700
Nashville, Tennessee 37203
P: (615) 252-4642
F: (615) 252-4708
jrodgers@bradley.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon the following via the Court's electronic case filing system and U.S. Mail, postage prepaid, on this the 19th day of September, 2019.

Joe P. Leniski, Jr. (TN BPR #022891)
J. Gerard Stranch, IV (TN BPR#023045)
BRANSTETTER, STRANCH &
JENNINGS PLLC
223 Rosa Parks Ave. Suite 200
Nashville, TN 37203
Email: joeyl@bsjfirm.com
            gerards@bsjfirm.com

Bryan Aylstock
AYLSTOCK, WITKIN, KREIS, &
OVERHOLTZ, PLLC
17 E. Main Street, Suite 200
Pensacola, Florida 32502
Email: balystock@awkolaw.com

*Attorney for Plaintiff*

*s/ John P. Rodgers*
John P. Rodgers

26